Robert Tauler  (SBN 241964)
rtauler@taulersmith.com
J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Jane Heiting*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE HEITING, individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br> vs.<br><br>INSURITY LLC, a Delaware limited liability company; and DOES 1 through 25, inclusive,<br><br>   Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br> **1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

CLASS ACTION COMPLAINT

## INTRODUCTION

1.     Defendant Insurity LLC ("Defendant" or "Insurity") uses data broker software on its website – https://insurity.com/ (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits.  The data broker software then compiles this data and correlates that data with extensive external records it already has about most Californians in order to learn the identity of the Website user.

2.     Defendant's installation and use of data broker software without obtaining consent is a violation of the California Trap and Trace Law.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

4.     Defendant is a Delaware limited liability company that sells cloud-based software for insurance claim management.  On information and belief, employs customer service representatives who are located or reside in California. Defendant actively markets its services and to California businesses and proprietors. It maintains ongoing business relationships with such California customers. Defendant derives substantial revenue from California-based transactions through its operation of the Website.  Defendant deliberately avails itself of California's commercial privileges by operating its interactive Website infrastructure, which Defendant specifically designed to engage California customers. Defendant's continuous California business activities establish general personal jurisdiction sufficient for this Court to adjudicate any claims against Defendant.

5.     Further, Defendant specifically intended its surveillance operations to

cause injury to California residents. Defendant configured its tracking systems on its Website to identify, profile, and exploit California users.

6.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

## **PARTIES**

7.      Plaintiff Jane Heiting ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.  Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

8.      Defendant is a Delaware limited liability company that owns, operates, and/or controls https://insurity.com/ (the "Website").  Through the Website, Insurity sells insurance-related software.

9.      Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

10.     Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

11.    Defendant is the proprietor of the Website.

12.    The Website, like most other websites, can determine the approximate geolocation of its visitors once the visitors request to visit the Website from their devices.  On information and belief, Defendant and the Website can determine the geolocation from, for example, a visitor's IP address.  The unlawful surveillance alleged herein collects information that can identify a Website visitor well beyond his or her IP.

13.    Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker").  Defendant has done this by installing at least one Data Broker Software Development Kit on the Website.

14.    DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

### Registered California Data Brokers

15.    Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations.  Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

16.    Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers,

financial institutions, online marketplaces, subscription services, and loyalty programs.

17.    Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

18.    Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

19.    Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

20.    Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

---

[1]  Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

**Defendant and the California Data Brokers**

21.    Defendant's installation and use of DBSDKs violates the California Trap and Trace law.

22.    Specifically, Defendant has installed the DBSDKs of Demandbase, Inc. (the "Demandbase SDK"), LiveRamp, Inc. (the "LiveRamp DBSDK"), NextRoll, Inc. (formerly known as AdRoll, Inc.) (the "NextRoll DBSDK") and Outbrain Inc. (the "Outbrain DBSDK") on its Website.

23.    The Demandbase DBSDK turns anonymous web traffic into identifiable leads by identifying people and accounts.

24.    First, when a user lands on a website loaded with the Demandbase DBSDK, the user's browser automatically sends - from the user's device - an HTTP request containing his or her IP address and other data.  The IP address provides the approximate geolocation of the device. The Demandbase DBSDK intercepts this request client-side (or via an API call server-side) to immediately grab the IP address and a unique cookie ID.  The Demandbase DBSDK collects details such as pages viewed, time on page, and referring source, all tied to an "unknown visitor" profile until that visitor is mapped to a known account.

25.    Second, Demandbase then uses this information to perform a lookup against its database, determining if the visit is being made by a known person or from a known account.  Demandbase also uses the persistent cookie ID to recognize repeat visits or additional behavior by the user.  Demandbase combines these web events ("engagement signals") with its own data and machine learning to identify the visitor's identity, company and other attributes.

26.    Third, in addition to on-website identification, Demandbase aggregates data across its client base to gauge "intent."  If the same cookie or IP is seen on multiple sites researching similar topics, Demandbase will classify the website visitor as "interested" in those topics.  This means the Demandbase cookie

effectively tracks user behavior across many websites in its network (often without user awareness).

27.    Demandbase's tracking system captures identifying signals in real time without consent. Demandbase states that its DBSDK functions by "matching engagement signals to accounts [. . .] combining proprietary data from different sources with machine learning to identify unknown engagement signals and map them back to a company."

28.    LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp DBSDK tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LiveRamp DBSDK functions as follows:

29.    First, when the LiveRamp DBSDK loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

30.    Second, the data obtained by the LiveRamp DBSDK is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline.   This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

31.    Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number).  LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices.  The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

32.    Identification of website visitors through the LiveRamp DBSDK happens in "real-time," allowing the websites of LiveRamp's customers to "access people-based data immediately at the time of impression."  It also works across devices: In other words, the LiveRamp DBSDK can inform websites using it that the same account or person has accessed the website from different devices. As LiveRamp explains, "[w]ith impressions matched to a persistent people-based ID, data are stitched across devices and not lost over time with new cookies or phones."

33.    NextRoll, Inc. ("NextRoll") is a marketing technology company specializing in retargeting and targeted advertising services.  NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

34.    The Nextroll DBSDK is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, the pixel tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site"  The NextRoll DBSDK functions as follows:

35.    First, when a user loads a page, the NextRoll DBSDK executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NextRoll DBSDK collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NextRoll DBSDK captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the

page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

36.    Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser.  This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll/NextRoll tracking.  NextRoll's ID cookie means the tracking persists beyond the single site. If another unrelated website also uses AdRoll, that same cookie ID will be recognized and the user's new visit will again be captured and associated with their existing profile.

37.    Third, Nextroll  platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery.  For example, if NextRoll's pixel finds a user, NextRoll can later synchronize that user's ID with, say, a Facebook or Google cookie to continue tracking user activity across the internet, storing all of the information in each discrete user profile.

38.    Outbrain is a content recommendation platform, advertising network and personalization engine for content. The Outbrain DBSDK functions as follows:

39.    First, when a page loads, the Outbrain DBSDK captures the user's IP address and translates that IP into a general geolocation (city/region). It also notes the device type, browser type, operating system, and referring URLs. All of this happens via the web requests the browser makes to Outbrain's domain to fetch content or ping for tracking.

40.    Second, the Outbrain DBSDK will drop a cookie on the user's browser (if not already present) to assign a Unique User ID (UUID). This UUID is an identifier that Outbrain uses to keep track of that user on any Outbrain-enabled site. Outbrain's systems catalogue and analyze the content the user consumes across partner sites associated with that UUID.

41.    Third, the Outbrain DBSDK logs information about the user's interaction with the page and stores it in order to accumulate a browsing profile about a user without their consent.

42.    Visitors to the Website do not meaningfully consent to the above-described identification. The tracking described herein is third-party and occurs by default.  Visitors to Defendant's Website are not made aware of, and are not able to disable, this tracking and identification.

**Plaintiff Was Subjected to Trap and Trace Devices on the Website**

43.    Plaintiff visited the Website on June 11, 2025.  When Plaintiff did so, their identifying information was sent to Data Brokers including Demandbase, Inc. ("Demandbase") LiveRamp, NextRoll and Outbrain, by way of electronic impulses.

44.    The purpose of this transfer of data from Defendant to the Data Brokers was for de-anonymization, profiling, targeting and ongoing browsing tracking (as described *supra*).    The transfer benefitted Defendant and the Data Brokers financially.

45.    On information and belief, the Data Brokers took Plaintiff's information and added the information to its profiles of Plaintiff.   In turn, Defendant received other relevant data obtained by the Data Brokers regarding Plaintiff. Further, the Data Brokers can use the information regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

46.    In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[2]  There are recent examples of tech companies

---

[2]    https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[3]  Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[4]

47.    The prospect of private entities such as Data Brokers sharing data they have collected and organized into individualized profiles with government entities has increased significantly in 2025.  Columbia and Brown Universities recently agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal government.[5]  During this year, tech companies have complied with unprecedented demands for concessions from the federal executive branch.[6]  Further, the current federal administration has threatened retaliatory action against pharmaceutical companies that refuse to comply with demands to lower drug prices.[7]  No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

---

[3] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/.

[4]     https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185.

[5] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html.

[6] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630.

[7] *See, e.g.,* Anna Bratulic, "In latest Trump salvo, pharma giants face 60-day ultimatum on price cuts," (First Word Pharma, July 31, 2025), found at https://firstwordpharma.com/story/5985417.

48.     The purpose of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs is to identify users and then track them on the internet.  Demandbase's own documentation confirms that its software is intended to "identify accounts, people…using our tags" promising "100% accuracy in account identification." Indeed, Demandbase explains that the Demandbase DBSDK works by "matching engagement signals to accounts."  The LiveRamp DBSDK "uses identifiers (such as name and postal address, email address, RampIDs, cookie IDs or mobile device IDs) to match [ ] records [concerning visitors to a customer's website] to other identifiers in our Identity Graph."  According to LiveRamp, "[a]n identity graph is a data structure that maps relationships between various identifiers [of persons or accounts] and links them."  The NextRoll DBSDK captures such information as user agent and IP address that can help identify a user across websites and platforms using the NextRoll DBSDK.  The Outbrain DBSDK captures a user's IP address, which it translates into geolocation data, as well as the user's device and browser type, and operating system.

49.     These four DBSDKs meet the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because the Demandbase, LiveRamp, NextRoll and Outbrain processes capture signaling information (who the visitor is, and what they are doing) in order to identify the source of an otherwise anonymous website visit – which such visit constitutes an electronic communication.

50.     There is no way for Plaintiff to learn what the Data Brokers did with Plaintiff's data, including what inferences the Data Brokers have gleaned from it, or when, why and to whom the Data Brokers have sold or licensed Plaintiff's data.  As such, Plaintiff has been injured by Defendant's surveillance practices.

51.     Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Brokers for mercantile purposes.  Plaintiff has no way to know the scope of the injury suffered because the Data Brokers operate in secret and without public disclosure of their operations.

**The Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs**
**Are Trap and Trace Devices.**

52.     CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

53.     Each of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs is a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with the Data Brokers to obtain the users' identifying information including telephone numbers.

54.     Each of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website. In fact, these DBSDKs are designed to meet this objective.

55.     Defendant did not obtain a court order before installing or using each of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs on its Website.

56.     Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with Demandbase, LiveRamp, NextRoll and Outbrain for the purposes of de-anonymization, profiling, and targeting.

57.     Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

58.     The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2,

638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

## **CLASS ALLEGATIONS**

59.    Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to registered California Data Brokers as a result of visiting the Website within the limitations period.**

60.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

61.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

> a.    Whether the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs are trap and trace processes as defined by California law;
>
> b.    Whether Plaintiff and Class Members are entitled to statutory damages;
>
> c.    Whether Class Members are entitled to injunctive relief; and

d.  Whether Class Members are entitled to disgorgement of
unlawfully obtained data.

62.  TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by Demandbase, LiveRamp, NextRoll and Outbrain, Plaintiff is asserting claims that are typical of the Class.

63.  ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

64.  SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient.  Even if every Class Member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law

### Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

65.  Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

66.  The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…."  Cal. Penal Code § 638.51(a).

67.  A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to

identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

68.     Each of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).  Each of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

69.     Defendant did not obtain a court order before using or installing each of the Demandbase, LiveRamp, NextRoll and Outbrain DBSDKs on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the LiveRamp, NextRoll and Outbrain DBSDKs, to identify visitors to its Website.

70.     CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2.     An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4.     Statutory damages pursuant to CIPA;

5.     Reasonable attorneys' fees and costs; and

6.      All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: October 17, 2025              TAULER SMITH LLP

                                     By:    */s/ Robert Tauler*
                                            Robert Tauler, Esq.
                                            J. Evan Shapiro, Esq.

                                     *Attorneys for Plaintiff Jane Heiting*

1

## **DEMAND FOR JURY TRIAL**

2

     Plaintiff hereby demands a trial by jury.

3

4

DATED: October 17, 2025       TAULER SMITH LLP

5

         By:    */s/ Robert Tauler*

6

              Robert Tauler, Esq.

              J. Evan Shapiro, Esq.

7

8

             *Attorneys for Plaintiff Jane Heiting*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28